Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| A.H., individually and on behalf of H.H. a minor,<br><br>        Plaintiff,<br><br>vs.<br><br>HEALTHKEEPERS, INC. D/B/A ANTHEM BLUE CROSS and BLUE SHIELD,<br><br>        Defendant. | COMPLAINT<br><br>Case No. 2:22-cv-00368 - JCB |

Plaintiff A.H. individually and on behalf of H.H. a minor, through her undersigned counsel, complains and alleges against Defendant Healthkeepers, Inc. D/B/A Anthem Blue Cross and Blue Shield ("Anthem") as follows:

**<u>PARTIES, JURISDICTION AND VENUE</u>**

1. A.H. and H.H. are natural persons residing in Chesterfield County, Virginia. A.H. is H.H.'s mother.

2. Anthem is the trade name of Anthem Health Plans of Virginia and was the insurer and claims administrator, as well as the fiduciary, for the Plan during the treatment at issue in

this case. Anthem is an independent licensee of the nationwide Blue Cross and Blue Shield Association.

3. The Plan is a fully insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). A.H. was a participant in the Plan and H.H. was a beneficiary of the Plan at all relevant times. A.H. and H.H. continue to be participants and beneficiaries of the Plan.

4. H.H. received medical care and treatment at Uinta Academy ("Uinta") from February 25, 2021 through February 23, 2022. Uinta is a licensed residential treatment facility located in Cache County Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Anthem denied claims for payment of H.H.'s medical expenses in connection with her treatment at Uinta.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah through its network of affiliates, and the treatment at issue took place in Utah.

8. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs she will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the

Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both her and H.H.'s privacy will be preserved.

9. The remedies the Plaintiff seeks are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## **BACKGROUND FACTS**

### **H.H.'s Developmental History and Medical Background**

10. When she was in the 7th grade, H.H. began complaining of near constant stomach aches and headache pain. She was discovered to be self-harming by cutting in the fall of 2019, and her grades began to decline. She was diagnosed with depression and began taking medications.

11. Shortly afterwards on December 4, 2019, she attempted suicide by overdosing on one of her medications. She was taken to the hospital and placed in the intensive care unit before being moved to the inpatient mental health unit.

12. Not long following this incident H.H. was hospitalized a second time after skipping school with a friend and procuring straight razors and a large bottle of Advil with the intent to self-harm and overdose.

13. She was then hospitalized a third time in April of 2020 due to suicidal ideation and erratic behavior.

14. In May of 2020, H.H. was hospitalized for a fourth time due to ongoing threatening behaviors towards herself and her mother. She was then diagnosed with borderline personality disorder.

15. Outpatient therapy was arranged for H.H. but she refused to participate and shortly afterwards she was admitted to a short-term residential program in Connecticut called Center for Discovery, followed by a partial hospitalization program and additional outpatient treatment.

16. H.H. was then readmitted to the emergency room due to ongoing suicidal ideation followed by a short stay at another residential program called St Joseph's Villa and another partial hospitalization program. H.H. attempted a Dialectical Behavioral Therapy program, but she was ejected after the first session due to her failure to cooperate.

17. On one occasion, H.H. repeatedly stated that she felt unsafe and asked her father to take her to the hospital. When he did not, H.H. ran away from home and went to the nearest hospital by herself where she stayed for about ten days.

18. Within 48 hours of her release she was then readmitted to the hospital and then began attending a partial hospitalization program. Her treatment team recommended that she receive additional care in an outdoor behavioral health program and H.H. was taken to a facility called Open Sky.

**Uinta**

19. H.H. was admitted to Uinta on February 25, 2021, following her discharge from Open Sky.

20. In a letter dated February 26, 2021, Anthem denied payment for H.H.'s treatment. The letter stated in pertinent part:

> This service is excluded or not covered under your plan benefits.
>
> This facility is not accredited. Per page 127 of your Evidence of Coverage (EOC), a residential treatment center/facility is required to have accreditation by The Joint Commission, The Commission on Accreditation of Rehabilitation Facilities, the National Integrated Accreditation for Healthcare Organizations, or the Council on Accreditation.

21. On May 24, 2021, Marcy Smith of the Mental Health & Autism Insurance Project submitted an appeal on H.H.'s behalf.

22. Marcy reminded Anthem that prior to her admission to Uinta, H.H. had seven inpatient hospitalizations, had attended four partial hospitalization programs, had attended residential treatment, had unsuccessfully attempted outpatient therapy on multiple occasions, and had even gone to a wilderness program, but she had been unable to adequately address her ongoing mental health issues and suicidal ideation at any of these facilities.

23. Marcy wrote that it was untenable for H.H. to continue a cycle of failed acute hospitalizations and outpatient care and she needed longer term residential treatment. Marcy included copies of H.H.'s medical records, as well as letters of medical necessity with the appeal. These records showed that H.H. continued to have frequent outbursts and experience significant emotional dysregulation.

24.  H.H. stated that "I do not care if I die," continued to experience self-harm urges and Uinta had to implement safety precautions to keep her safe.

25. Marcy contended that Anthem was in violation of MHPAEA. She wrote that insurers were required to ensure that limitations on mental health care were no more restrictive than the limitations applied to analogous medical or surgical care. She identified skilled nursing care as one of the medical or surgical analogues to residential treatment.

26. Specifically, Marcy alleged that Anthem's requirement that residential treatment facilities be accredited by The Joint Commission, the Commission on Accreditation of Rehabilitation Facilities, The National Integrated Accreditation for Healthcare Organizations, or the Council on Accreditation was a violation of MHPAEA as it did not equally apply this requirement to analogous medical or surgical services.

27. In fact, Anthem specifically stated in the definition for residential treatment centers that its accreditation requirement did not apply to:

- Nursing care
- Rest care
- Convalescent care
- Care of the aged
- Custodial Care
- Educational care

28. She quoted the definition of a skilled nursing facility which included the statement that "It must be licensed by the appropriate agency and accredited by The Joint Commission (TJC) or the Bureau of Hospitals of the American Osteopathic Association, or otherwise approved by us." She stated that this was a "clear bifurcation of accreditation requirements" and showed that Anthem was placing more onerous requirements on residential treatment than analogous medical or surgical facilities which was a violation of MHPAEA.

29. Marcy wrote that she had shown Anthem had violated MHPAEA because:

(1) The relevant group health plan is subject to the Parity Act;
(2) The plan provides both medical/surgical benefits and mental health or substance use disorder benefits;
(3) The plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and
(4) The mental health or substance use disorder benefit being limited is in the same classification as the medical/surgical benefit to which it is being compared.

30. Marcy pointed out that H.H. had attempted numerous in-network treatment programs but none of them had been effective and H.H.'s "health deteriorated to an alarmingly dangerous state by December 2020." H.H.'s clinicians felt H.H. was a serious risk of harm or injury without inpatient treatment.

31. Marcy stated that prior to H.H.'s admission to Uinta, A.H. contacted Anthem to discuss treatment options and was only given the names of three facilities, two of which only provided treatment for adults and the other of which was a community service board and not a program or facility. She argued that Anthem's in-network options were ineffective, meaning that H.H. had to receive treatment at an out-of-network facility.

32. In a letter dated June 7, 2021, Anthem upheld the denial of payment for H.H.'s treatment. The letter gave the following justification for the denial:

> After careful review, the administrative denial of psychiatric residential treatment center level of care at Uinta Academy for dates of service February 25, 2021 forward due to the provider not being appropriately accredited has been upheld. Your … [employer] benefit plan requires that residential treatment facilities be accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO) or the Council on Accreditation (COA). A review of the provider Uinta Academy shows that they not accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA). On page 127 of your … [employer] benefit booklet, under definition of residential treatment facility it states:
>
> **Residential Treatment Center / Facility:**
> A Provider licensed and operated as required by law, which includes:
> 1. Room, board and skilled nursing care (either an RN or LVN/LPN) available on-site at least eight hours daily with 24 hour availability;
> 2. A staff with one or more Doctors available at all times.
> 3. Residential treatment takes place in a structured facility-based setting.
> 4. The resources and programming to adequately diagnose, care and treat a psychiatric and/or substance use disorder.
> 5. Facilities are designated residential, subacute, or intermediate care and may occur in care systems that provide multiple levels of care.

6. Is fully accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA)

The health plan's determination is not a violation of the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA) and is not imposing Non-Quantitative Treatment Limitations. We treat residential treatment centers the same as all intermediate levels of care and we are not holding your residential treatment to a stricter standard. All facilities, medical and behavioral health, under your … [employer] benefit plan are required to be accredited, including Skilled Nursing Facilities. On page 122 of your benefit booklet, under the definition of Facility it states:

**Facility**
A facility including but not limited to, a Hospital, freestanding Ambulatory Surgical Facility, Chemical Dependency Treatment Facility, Residential Treatment Center, Skilled Nursing Facility, Home Health Care Agency or mental health facility, as defined in this Booklet. The Facility must be licensed, accredited, registered or approved by The Joint Commission or the Commission on Accreditation of Rehabilitation Facilities (CARF), as applicable or meet specific rules set by us.

Additional information regarding Anthem's compliance with Non-Quantitative Treatment Limitations is attached.

33. The attached document was titled NQTL SELF COMPLIANCE TOOL and appeared to primarily deal with the admission and rejection of providers to Anthem's in-network provider services based on whether they comply with several factors set by Anthem's National Credentials Committee. It did not appear to be particularly relevant to A.H.'s that Anthem's denial of H.H.'s treatment was a violation of MHPAEA.

34. The Plaintiff exhausted her pre-litigation appeal obligations.

35. The denial of benefits for H.H.'s treatment was a breach of contract and caused A.H. to incur medical expenses that should have been paid by the Plan in an amount totaling over $250,000.

//

**CAUSE OF ACTION**

**(Claim for Under 29 U.S.C. §1132(a)(3) for Violation of MHPAEA
and Breach of Fiduciary Duty)**

36. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and
beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply
with both ERISA and MHPAEA is part of Anthem's fiduciary duties.

37. Generally speaking, MHPAEA requires ERISA plans to provide no less generous
coverage for treatment of mental health and substance use disorders than they provide for
treatment of medical/surgical disorders.

38. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health
or substance use disorder benefits that are more restrictive than the predominant
treatment limitations applied to substantially all medical and surgical benefits and also
makes illegal separate treatment limitations that are applicable only with respect to
mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

39. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not
limited to, medical management standards limiting or excluding benefits based on
medical necessity; refusal to pay for higher-cost treatment until it can be shown that a
lower-cost treatment is not effective; and restrictions based on geographic location,
facility type, provider specialty, or other criteria that limit the scope or duration of
benefits for mental health or substance use disorder treatment. 29 C.F.R.
§2590.712(c)(4)(ii)(A), (F), and (H).

40. The medical necessity criteria used by Anthem for the intermediate level mental health
treatment benefits at issue in this case are more stringent or restrictive than the medical

necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

41. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for H.H.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

42. The Departments of Labor and Health and Human Services jointly compiled a list of "warning signs" which often accompany a violation of MHPAEA. Among the items listed are disparities in licensure requirements between mental health services and medical/surgical services.

43. Uinta is a licensed residential treatment facility by the State of Utah despite its lack of accreditation by The Joint Commission, the Commission on Accreditation of Rehabilitation Facilities, the National Integrated Accreditation for Healthcare Organizations, or the Council on Accreditation.

44. The appropriate regulatory and licensing agencies could have made accreditation by specific agencies such as The Joint Commission a requirement for a facility to be licensed as a residential treatment center. The fact that they chose not to do so demonstrates that Anthem's requirements of accreditation for residential treatment are more restrictive than necessary as well as generally accepted standards of medical practice.

45. Anthem is not bound by the State of Utah's decision to not require accreditation, but it cannot require accreditation for residential treatment centers without ensuring that analogous medical or surgical facilities are also required to be accredited as a prerequisite to obtaining coverage under the terms of the Plan.

46. The summary plan description defines a residential treatment facility as:

> A Provider licensed and operated as required by law, which includes:
> 1. Room, board and skilled nursing care (either an RN or LVN/LPN) available on-site at least eight hours daily with 24 hour availability;
> 2. A staff with one or more Doctors available at all times.
> 3. Residential treatment takes place in a structured facility-based setting.
> 4. The resources and programming to adequately diagnose, care and treat a psychiatric and/or substance use disorder.
> 5. Facilities are designated residential, subacute, or intermediate care and may occur in care systems that provide multiple levels of care.
> 6. Is fully accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA).
>
> The term Residential Treatment Center/Facility does not include a Provider, or that part of a Provider, used mainly for:
>
> 1. Nursing care
> 2. Rest care
> 3. Convalescent care
> 4. Care of the aged
> 5. Custodial Care
> 6. Educational care

47. A hospice facility is defined as: "A Provider that gives care to terminally ill patients and their families, either directly or on a consulting basis with the patient's Doctor. It must be licensed by the appropriate agency."

48. Anthem's requirements for a hospice facility are able to be communicated in two sentences. However, as noted above, the requirements for residential treatment care to be approved are significantly more stringent and include requirements such as accreditation through specific agencies which are not required of hospice care.

49. The summary plan description defines rehabilitation services as:

> Benefits include services in a Hospital, free-standing Facility, Skilled Nursing Facility, or in an outpatient day rehabilitation program.

Covered Services involve a coordinated team approach and several types of treatment, including skilled nursing care, physical, occupational, and speech therapy, and services of a social worker or psychologist.

To be Covered Services, rehabilitation services must involve goals you can reach in a reasonable period of time. Benefits will end when treatment is no longer Medically Necessary and you stop progressing toward those goals.

Please see "Therapy Services" in this section for further details.

50. Notably, Anthem does not even require these services, whether provided on an inpatient or outpatient basis, to be licensed, let alone requiring that facilities be accredited.

51. The closest medical or surgical analogue to residential treatment in terms of requirements is likely a skilled nursing facility which the Plan defines as:

A Facility operated alone or with a Hospital that cares for you when you have a condition that needs more care than you can get at home. It must be licensed by the appropriate agency and accredited by the The Joint Commission or the Bureau of Hospitals of the American Osteopathic Association or otherwise approved by us. A Skilled Nursing Facility gives the following:

1. Inpatient care and treatment for people who are recovering from an illness or injury;
2. Care supervised by a Doctor
3. 24 hour per day nursing care supervised by a full time registered nurse.

A Skilled Nursing Facility is not a place mainly for care of the aged, Custodial Care or domiciliary care, treatment of alcohol or drug dependency; or a place for rest, educational, or similar services.

52. A comparison of the definition of residential treatment facilities and skilled nursing facilities reveals that the most restrictive medical or surgical analogue, skilled nursing care, has three numbered requirements while residential treatment facilities have six numbered requirements they are forced to meet as a prerequisite to coverage and that the elements for residential treatment facilities are often more difficult to satisfy.

53. For example, supervision by a doctor in a skilled nursing facility for instance, does not necessarily require a doctor to be present while work is done. Residential treatment facilities however require a doctor to be available "at all times."

54. Equally pertinent is that in its definition of a residential treatment facility, Anthem states that its accreditation requirement does not apply to:

- Nursing care
- Rest care
- Convalescent care
- Care of the aged
- Custodial Care
- Educational care

55. This exemption for these services which are primarily medical in nature is a direct example of Anthem exempting medical or surgical services from requirements it places on residential treatment care.

56. As another example of the disparity between the nonquantitative treatment limitations between residential treatment facilities and skilled nursing facilities, residential treatment facilities must, without exception, be licensed and accredited while skilled nursing facilities must be licensed and either accredited OR "otherwise approved by us [Aetna]."

57. As a final example of violation of MHPAEA by Aetna imposing more restrictive treatment limitations for mental health and substance use disorder treatment than for analogous levels of medical and surgical care, the definition of a facility cited by Anthem states:

> A facility including but not limited to, a Hospital, freestanding Ambulatory Surgical Facility, Chemical Dependency Treatment Facility, Residential Treatment Center, Skilled Nursing Facility, Home Health Care Agency or mental health facility, as defined in this Booklet. The Facility must be licensed, accredited, registered **OR** approved by The Joint Commission or the Commission on Accreditation of Rehabilitation Facilities (CARF), **AS APPLICABLE OR MEET SPECIFIC RULES SET BY US** (emphasis added).

58. In fact, Anthem was unable to recommend a suitable in-network residential treatment facility which satisfied all of Anthem's Plan requirements.

59. While Anthem cannot control the number of residential treatment centers in a given area, it can and does use other factors such as accreditation by The Joint Commission to greatly limit the availability of residential treatment at facilities for which it will provide coverage.

60. This allows Anthem to offer the appearance of covering residential treatment services with a significantly reduced likelihood of ever having to actually pay residential treatment facility claims.

61. As a result, Anthem obtains significant financial benefit at the expense of Plan participants and beneficiaries whose claims for benefits are denied.

62. Anthem's behavior constitutes a breach of its fiduciary duty to "discharge [its] …. duties with respect to a plan solely in the interest of the participants and beneficiaries and … for the exclusive purpose of … providing benefits to participants and their beneficiaries." 29 U.S.C. §1104(a)(1)(A)(i).

63. When Anthem and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

64. Anthem and the Plan evaluated H.H.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

65. Anthem wrote that it was not applying a nonquantitative treatment limitation because it requires all facilities to be accredited, however the above definitions as well as the actual citation from Anthem, undermine rather than bolster this assertion.

66. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

67. The violations of MHPAEA and breaches of fiduciary duty by Anthem and the Plan give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendant violate MHPAEA;

(b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendant from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiff for her loss arising out of the Defendant's violation of MHPAEA.

68. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for H.H.'s medically necessary treatment at Anthem under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 2nd day of June, 2022.

By ____s/ Brian S. King_____
       Brian S. King
       Attorney for Plaintiff

County of Plaintiff's Residence:
Chesterfield County, Virginia.