IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| A.H., individually and on behalf of H.H., a minor,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>HEALTHKEEPERS, INC. D/B/A ANTHEM BLUE CROSS and BLUE SHIELD,<br><br>　　　　　　　Defendant. | MEMORANDUM DECISION AND ORDER<br><br><br>Case No. 2:22-cv-368-TS-CMR<br><br>District Judge Ted Stewart |

This matter is before the Court on cross Motions for Summary Judgment. For the reasons discussed below, the Court will grant Defendant's Motion and deny Plaintiff's Motion.

I. BACKGROUND

Plaintiff A.H. is an individual suing on behalf of H.H., a minor. During the time at issue, A.H. was a participant in a fully insured employee welfare benefits plan ("the Plan") subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). Through A.H., H.H. was a beneficiary of the Plan. Defendant Healthkeepers was the insurer and claims administrator for the Plan.

In 2019, in her teen years, H.H. was discovered to be participating in self-harm. Within the same year, she made her first suicide attempt by overdosing on her prescribed medications. Over the following years, H.H. continued to suffer from suicidal ideations and was hospitalized numerous times as a result. She was also enrolled in various treatment programs, each of which failed to adequately address her ongoing mental health issues.

1

On February 25, 2021, H.H. was admitted to Uinta Academy, a residential treatment facility. Shortly thereafter, Defendant issued a letter explaining that it was denying benefits for H.H.'s treatment because Uinta Academy was not appropriately accredited as required by the Plan.[1] That denial was upheld on appeal.[2] Plaintiff now brings claims under the Mental Health Parity and Addiction Equity Act ("MHPAEA" or "Parity Act").

## II. SUMMARY JUDGMENT STANDARD

In an ERISA case, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor."[3]

## III. DISCUSSION

"Congress enacted the [Parity Act] to end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."[4] The Parity Act requires that a plan's treatment and financial limitations on mental health or substance abuse disorder benefits be no more restrictive than the limitations for medical and surgical benefits.[5]

The Parity Act's implementing regulations state:

> A [group health] plan (or health insurance coverage) may not impose a nonquantitative treatment limitation with respect to mental health or substance use

---

[1] Docket No. 51-6, at 8.

[2] Docket No. 51-7.

[3] *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

[4] *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 356 (2d Cir. 2016).

[5] *See* 29 U.S.C. § 1185a(a)(3)(A)(ii).

disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in designing and applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in designing and applying the limitation with respect to medical/surgical benefits in the classification.[6]

To prevail Plaintiff must prove

(1) . . . that the relevant group health plan is subject to MHPAEA; (2) identify a specific treatment limitation on mental health or substance-use disorder benefits covered by the plan; (3) identify medical or surgical care covered by the plan that is analogous to the mental health or substance-use disorder care for which the plaintiffs seek benefits; and (4) [demonstrate] a disparity between the treatment limitation on mental health or substance-use disorder benefits as compared to the limitations that defendants would apply to the medical or surgical analog.[7]

A Parity Act claim can be brought as either a facial challenge or an as-applied challenge.[8] "A facial challenge focuses on the terms of a plan."[9] "By contrast, as-applied challenges focus on treatment limitations that a plan applies in operation."[10] In an as-applied challenge, a plaintiff must prove that a "defendant differentially applies a facially neutral plan term."[11]

Plaintiff first asserts a facial challenge. Here, there is no dispute that the Plan is covered by the Parity Act and the parties agree that skilled nursing facilities are analogous to residential treatment centers. Defendant contends that it treats residential treatment centers and skilled nursing facilities the same in that it requires both be licensed and accredited. Plaintiff argues that

---

[6] 29 C.F.R. § 2590.712(c)(4)(i)(A).

[7] *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1283 (10th Cir. 2023).

[8] *Id.* at 1284.

[9] *Id.*

[10] *Id.* (internal quotation marks and citation omitted).

[11] *Id.* (internal quotation marks and citation omitted).

the Plan terms provide an exception to the accreditation requirement for skilled nursing facilities that is not available for residential treatment services. To resolve this dispute the Court looks to the Plan terms.

In interpreting the terms of an ERISA plan, the Court applies general rules of contract construction and interprets the plan like any other contract by examining its language and determining the parties' intent.[12] The Court "adhere[s] to definitions the parties adopt"[13] and for undefined terms it considers the "common and ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean."[14] The Court considers the plan documents as a whole and, if unambiguous, construes them as a matter of law.[15]

"In order to determine whether a plan is ambiguous, we consider the common and ordinary meaning as a reasonable person in the position of the plan participant, not the actual participant, would have understood the words to mean."[16] "Ambiguity exists where a plan provision is reasonably susceptible to more than one meaning, or where there is uncertainty as to the meaning of the term."[17]

---

[12] *Deboard v. Sunshine Mining & Ref. Co.*, 208 F.3d 1228, 1240 (10th Cir. 2000) (quoting *Capital Cities/ABC, Inc. v. Ratcliff*, 141 F.3d 1405, 1411 (10th Cir. 1998)).

[13] *E.W.*, 86 F.4th at 1286.

[14] *Miller v. Monumental Life Ins. Co.*, 502 F.3d 1245, 1250 (10th Cir. 2007) (internal quotation marks and citation omitted).

[15] *Id.*

[16] *Salisbury v. Hartford Life & Accident Ins. Co.*, 583 F.3d 1245, 1248 (10th Cir. 2009) (internal quotation marks and citation omitted).

[17] *Miller*, 502 F.3d at 1250 (internal quotation marks and citation omitted).

Under the terms of the Plan, a Residential Treatment Center/Facility is:

A Provider licensed and operated as required by law, which includes:
1. Room, board and skilled nursing care (either an RN or LVN/LPN) available on-site at least eight hours daily with 24 hour availability;
2. A staff with one or more Doctors available at all times.
3. Residential treatment takes place in a structured facility-based setting.
4. The resources and programming to adequately diagnose, care and treat a psychiatric and/or substance use disorder.
5. Facilities are designated residential, subacute, or intermediate care and may occur in care systems that provide multiple levels of care.
6. Is fully accredited by The Joint Commission (TJC), the Commission on Accreditation of Rehabilitation Facilities (CARF), the National Integrated Accreditation for Healthcare Organizations (NIAHO), or the Council on Accreditation (COA).[18]

A Skilled Nursing Facility is:

A Facility operated alone or with a Hospital that cares for you after a Hospital stay when you have a condition that needs more care than you can get at home. It must be licensed by the appropriate agency and accredited by The Joint Commission or the Bureau of Hospitals of the American Osteopathic Association, or otherwise approved by us. A Skilled Nursing Facility gives the following:
1. Inpatient care and treatment for people who are recovering from an illness or injury;
2. Care supervised by a Doctor;
3. 24 hour per day nursing care supervised by a full-time registered nurse.[19]

Both Residential Treatment Centers and Skilled Nursing Facilities are considered

Facilities under the Plan. A Facility is defined as:

A facility including but not limited to, a Hospital, freestanding Ambulatory Surgical Facility, Chemical Dependency Treatment Facility, Residential Treatment Center, Skilled Nursing Facility, Home Health Care Agency or mental health facility, as defined in this Booklet. The Facility must be licensed, accredited, registered or approved by The Joint Commission or the Commission on Accreditation of Rehabilitation Facilities (CARF), as applicable or meet specific rules set by us.[20]

---

[18] Docket No. 51-2, at 132.

[19] *Id.* at 133.

[20] *Id.* at 127.

Plaintiff argues that under the terms of the Plan, a Residential Treatment Center must be licensed and accredited. However, though Skilled Nursing Facilities also have licensure and accreditation requirements, they can be covered providers if they are "otherwise approved by" Defendant. Thus, under Plaintiff's interpretation, Residential Treatment Centers must always be accredited, while Skilled Nursing Facilities may avoid accreditation by being "otherwise approved" by Defendant.

Defendant counters that, since they are both Facilities under the terms of the Plan, there is no disparity because the "exception" to the accreditation requirement applies to all Facilities, as the term is defined by the Plan. As stated above, any Facility—which includes both Residential Treatment Centers and Skilled Nursing Facilities—must be licensed and accredited, registered, or approved by The Joint Commission or the Commission on Accreditation of Rehabilitation Facilities, but they may also be covered providers if they "meet specific rules set by" Defendant.

The Court agrees that the plain language of the Plan offers an alternative to accreditation for all Facilities, including both Residential Treatment Centers and Skilled Nursing Facilities. Even though the definition of Residential Treatment Center in the Plan does not contain the same "otherwise approved" language contained in the definition of Skilled Nursing Facility, a Residential Treatment Center is nonetheless a Facility and all facilities must either be accredited or "meet specific rules set by" Defendant. Thus, the Plan does not impose any disparate limitations on Residential Treatment Centers. Like any Facility, a Residential Treatment Center can become an approved provider either by accreditation or by the alternative path offer by the Plan. This conclusion is bolstered by the fact that another provision of the Plan, states that

"[e]ach participating Facility is subject to specific licensing, accreditation and credentialing requirements."[21]

Plaintiff argues that the Court should give greater weight to the more specific definition of Residential Treatment Center than the general definition of Facility. While it is true that "specific terms and exact terms are given greater weight than general language,"[22] the Court must provide "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms"[23] without rendering any term superfluous.

Here, Plaintiff's interpretation would render the term Facility completely meaningless, which runs counter to basic contract principles.[24] Instead, the Plan terms must be read in conjunction with each other. Further, as will be discussed further below, Plaintiff's proposed interpretation is undermined by the fact that Defendant's alternative credentialling process applies to both Skilled Nursing Facilities and Residential Treatment Centers. If Defendant did

---

[21] *Id.* at 133.

[22] Restatement (Second) of Contracts § 203(c); *see also Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010) (Under general principles of federal common law, which apply to ERISA plans, "[c]ontract interpretations should, to the extent possible, give effect to all language without rendering any term superfluous, but if both a general and a specific provision apply to the subject at hand, the specific provision controls.") (citation omitted); *Saltzman v. Indep. Blue Cross*, 384 F. App'x 107, 114 (3d Cir. 2010) ("We apply the rules of construction of contracts to ERISA plans: the plan must be considered as a whole; straightforward, unambiguous language should be given its natural meaning; and, if a specific provision found in the plan conflicts with a general provision, the specific provision should control.").

[23] Restatement (Second) of Contracts § 203(a).

[24] *United States v. Brye*, 146 F.3d 1207, 1211 (10th Cir. 1998) (quoting *New Valley Corp. v. United States*, 119 F.3d 1576, 1580 (Fed. Cir. 1997)) ("An interpretation that gives a reasonable meaning to all of [the contract's] parts is preferred to one which leaves a portion of the [contract] inoperative, void, meaningless, or superfluous.").

not intend for an alternative route for credentialing Residential Treatment Centers, as Plaintiff contends, there is no reason for them to be included in Defendant's Credentialing Policy. Therefore, the Court finds that there is no facial disparity in the Plan. Simply put, licensure and accreditation is generally required for both Residential Treatment Centers and Skilled Nursing Facilities, but both types of facilities may become covered providers by the alternative method set out in Defendant's Credentialing Policy.

Turning to Plaintiff's as applied challenge, Plaintiff argues that, even under Defendant's interpretation, Uinta met the "specific rules" set out in Defendant's Credentialing Policy.[25] While generally requiring "accreditation by an appropriate, recognized accrediting body," "in the absence of such accreditation, [Defendant] may evaluate the most recent site survey by Medicare, the appropriate state oversight agency, or a site survey performed by a designated independent external entity within the past thirty-six (36) months."[26]

Plaintiff contends that state law required such site visits. This is incorrect as it relates to Defendant's initial denial. Utah state law permitted, but did not require site visits at that time, as Plaintiff concedes.[27] Instead, quarterly inspections were not required until May 5, 2021.[28] Nevertheless, Plaintiff contends that since Uinta's license was valid through May 31, 2021, it

---

[25] Docket No. 51-4.

[26] *Id.* at 15.

[27] Docket No. 61, at 10.

[28] 2021 Utah Laws Ch. 400 (S.B. 127) (effective May 5, 2021); Utah Code Ann. § 26B-2-104(1)(f).

was subject to these new inspection requirements.[29] However, there is no evidence that Uinta was inspected during the 26 days between the law's enactment and the expiration of its license.

Moreover, even if a site survey was conducted by the appropriate state agency, it does not follow that the facility would have met Defendant's Credentialing Policy and, thereby be an approved provider. The Credentialing Policy uses the permissive "may." Thus, the mere fact that a site visit might have been conducted does not mean that Uinta would meet Defendant's eligibility criteria. As the Credentialing Criteria sets out, non-accredited facilities "are subject to individual review by the [Credentials Committee ('CC')] and will be considered for Member access need only when the CC review indicates compliance with Anthem standards and there are no deficiencies noted on the Medicare or state oversight review which would adversely affect quality or care or patient safety."[30] Here, there is no evidence to suggest that the CC conducted a review of Uinta or, if it did, that Uinta met the required standards.

More to the point, there is no evidence that there is any disparity between mental health providers and their medical or surgical analogs with respect to any alternative credentialling process. Defendant's Credentialing Policy applies to all Health Delivery Organizations ("HDO"), which includes both skilled nursing facilities and inpatient rehabilitation facilities, including residential treatment centers.[31] The eligibility criteria is the same for all HDOs.[32] Plaintiff provides nothing to suggest that Defendant has applied a more stringent standard on mental

---

[29] Docket No. 57-1, at 472.

[30] Docket No. 51-4, at 16.

[31] *Id.* at 2–3.

[32] *Id.* at 16–17.

health treatment facilities than it has for their medical/surgical analogs. For example, there is no evidence that Defendant has paid benefits to a medical/surgical facility that was not accredited or credentialed. As such, there is no evidence that the credentialling requirements are any more onerous for mental health treatment facilities than for their medical/surgical counterparts or that they were enforced unevenly. Therefore, Plaintiff's Parity Act claim fails.

## IV.  CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 47) is GRANTED. It is further

ORDERED that Plaintiff's Motion for Summary Judgment (Docket No. 48) is DENIED.

DATED this 26th day of August, 2025.

BY THE COURT:

Ted Stewart
United States District Judge